Hillsborough, ⎱
　Oct. 2, 1906. ⎰

## LORD, *Adm'r*, v. BOSTON & MAINE RAILROAD.

The duty of a master to warn servants of a transitory danger of the employ-
ment extends only to those whose exposure thereto ought reasonably to be
anticipated.

The members of a train crew are not guilty of negligence in failing to appre-
hend that a pedestrian, who occupies a position of safety and knows that a
railroad track is in use, will suddenly step in front of moving cars without
taking any precaution to avoid injury.

A railroad company is not liable for injuries to a pedestrian whose presence
was not reasonably to be foreseen, unless the employees of the corporation
failed to use due care to avoid a collision after discovering his danger.

The failure of a railroad company to prescribe proper rules for the protection
of persons likely to be in the path of moving cars does not render the cor-
poration liable for injuries to one whose presence upon the right of way
was not reasonably to be anticipated.

CASE, for negligently causing the death of Cyrille Lebrecque,
the plaintiff's intestate. Trial by jury. At the close of the plain-
tiff's evidence the defendants moved for a nonsuit on the grounds
(1) that the evidence did not warrant a finding of due care on the
part of the decedent, and (2) that it could not properly be found
that the defendants were guilty of negligence which was the sole
cause of the injury complained of. The motion was denied upon
the first ground, subject to the defendants' exception, and was
granted upon the second ground, subject to the plaintiff's excep-
tion. Transferred from the September term, 1904, of the superior
court by *Chamberlin*, J.

Lebrecque was an able-bodied man in full possession of his fac-
ulties. During the twenty years prior to his death he had been
employed by the defendants at different times for about seven
years, working as trackman, shoveler, and laborer in the Manches-
ter repair shop. February 15, 1900, he was sent with others to
repair a washout at Kelley's Falls. The crew left Manchester
early in the morning, on a train made up, from front to rear, of
ten coal cars loaded with ashes, five empty flat cars, engine, com-
bination car, and caboose. The men rode in the caboose and com-
bination car, and left their dinners in them while they were at
work. The train stopped before reaching the washout, and the
empty cars were dropped in on a side track 400 feet long, which
led to a gravel pit and was controlled by a switch in the main line
620 feet south of the washout. A switch in the side track at a
point 190 feet south of the main-line switch controlled another

side track, located between the main line and the pit track and called the middle track. Between the switches the pit track was built on an embankment, on either shoulder of which one might walk in safety when the track was in use. There was a slight descent in the grade from the washout to both switches, and a car starting from the washout would move into either side track by its momentum. The barbed wire fence on the westerly side of the railroad extended down the pit track to a point about twenty feet south of the second switch, where it turned and crossed both side tracks, and then continued in a southerly direction between the middle track and the main line. The side tracks were so near together at the point where they were crossed by the fence that one set of bars was sufficient for both and provided the only passageway through the fence. The shortest route from the main-line switch to the gravel pit was by way of the pit track.

After dropping the flat cars, the train proceeded to the washout, some of the crew being detailed to unload the foremost car while others were sent to the gravel pit. In making repairs, the loaded cars were run up to the washout, the forward car was emptied, and the train was then backed down the main line. Just before the main-line switch was reached, the pin which coupled the empty car was pulled and the rest of the train moved away from that car. The switch was set for the side track as soon as the train had passed over it, and the empty car ran in upon the middle track by its momentum. This process was repeated until seven were unloaded and run in upon the middle track, when the three remaining cars were left at the washout and the balance of the train backed down to Manchester. The engine returned with the caboose and combination car at quarter past twelve and stopped on the main line near the bars. The men at the gravel pit then quit work, walked up the side track and through the bars, and entered the cars where they had left their dinners. Lebrecque worked at the washout until about eleven o'clock, when he was sent to the gravel pit and remained there until work was suspended for dinner. At noon he became irritated because the men were not ordered to quit work. He was assured by the foreman that he should have a full hour for dinner, but continued to talk about working overtime, and was finally told that he might leave if he was dissatisfied. He entered the caboose with others and was not noticed again until he was seen by the trainmen just before his injury.

After the shovelers had entered the cars for dinner, the engine was taken to the washout, coupled to the three cars which had been left there, and backed down in order to run the cars upon the middle track. When the engine started on this trip, one of the

brakemen set the middle-track switch and then walked toward the main-line switch. When he had nearly reached the latter point he passed Lebrecque, who was walking in the direction of the gravel pit on the westerly side of the side track, but so far from the rail that he was in no danger of injury by passing cars. Lebrecque had left his coat at the gravel pit, and it was supposed he was going after it. After the engine had passed, the brakeman set the switch for the side track and let the cars run in. He then looked down the side track, saw Lebrecque just stepping over the rail, and shouted to him, but was unable to tell whether his warning was heard. At this time the engineer and fireman were on the locomotive, and the bell was rung continuously. The conductor was on the front of the engine, where he had gone for the purpose of uncoupling the cars. The second brakeman rode on the middle car for the purpose of controlling the cars after their detachment from the engine. Just before he reached the switch he saw Lebrecque on the west side of the track and at a safe distance from it. He paid no more attention to him until he heard a shout, when he looked again and saw Lebrecque walking between the rails. The front end of the forward car was then about sixty feet from Lebrecque, and the brakeman was powerless to prevent an accident. The fireman also shouted a warning to Lebrecque, who looked around, but was unable to escape. The accident happened about 110 feet south of the main-line switch, at which point the distance between the main line and the side track is about twenty feet.

The attention of the shovelers was not directed to the methods employed in shifting cars upon the side tracks, but they would have seen how the work was done if they had looked when they were at the washout or at the gravel pit. The only rule of the defendants in relation to flying switches was that they were to be made only when absolutely necessary. It was necessary to make them at the place of the accident. There was no evidence that other rules in respect to flying switches were in force on other railroads, or that other roads employed larger train crews when doing work of that nature.

*Taggart, Tuttle, Burroughs & Wyman* and *Andrews & Andrews*, for the plaintiff.

*Branch & Branch* and *William H. Sawyer*, for the defendants.

YOUNG, J. The plaintiff claims that the defendants were in fault because they failed to notify the deceased of the dangers incident to the service by reason of the method they employed in

setting off cars on side tracks like that leading to the gravel pit: Conceding that the danger incident to moving cars in this way is a matter in respect to which it is the master's duty to notify his servants, the plaintiff cannot be heard to complain of the defendants' failure to do so unless there is evidence from which it can be found that they ought to have anticipated the decedent would be where he was at the time he was killed; for the duty of notifying servants of the transitory dangers of their employment is imposed on the master for the benefit of those servants only whom he ought to anticipate will be injured if he fails to notify them. *McGill* v. *Company*, 70 N. H. 125; *Batchelder* v. *Railroad*, 72 N. H. 528. In order, therefore, to determine whether the plaintiff can be heard to complain that the defendants were in fault because of their failure to notify the deceased of the danger which was the cause of his death, it is necessary to inquire whether they ought to have anticipated that he would step onto this track before the cars had passed him.

Since a person is bound to anticipate all that the ordinary man would anticipate in his situation, the test to determine whether the defendants ought to have anticipated the deceased's action is to inquire whether an ordinary man, who knew all the defendants either knew of the situation and its dangers or would have known if they had used ordinary care for their servant's safety, would have anticipated that Lebrecque was likely to step upon the track before the cars passed him. If this were a suit against the train crew, it would be necessary to determine whether they should have anticipated Lebrecque's action in order to determine whether or not they were in fault for not anticipating it. It is clear that the test to determine that question would be the same as that to determine whether the defendants were in fault; for the evidence shows that the train crew knew all that could be known of the situation and its dangers.

It could be found that the train crew were negligent if there was a time, however short, when they could, and the deceased could not, have prevented the accident by the use of ordinary care. There is no view of the case in which it can be found that the defendants were and the train crew were not in fault, if it could not be found that the train crew were bound to anticipate the action of the deceased. Consequently the plaintiff will not be prejudiced if this case is considered as though the train crew were the defendants. The test to determine whether or not the train crew were in fault would be to inquire (1) whether they ought to have anticipated that the deceased would do what he did at the time of the accident; and if not, (2) whether there was anything they could have done to prevent an accident after they knew of his danger.

1. If the deceased had been walking directly toward the side track without apparently noticing the cars, instead of beside and at a safe distance from it, it could not be found that the train crew ought to have anticipated that he would step in front of the cars they were dropping in on this track. *Gahagan* v. *Railroad*, 70 N. H. 441; *Waldron* v. *Railroad*, 71 N. H. 362. If it could not be found they ought to have anticipated that he would step onto the track under such circumstances, it is obvious that it cannot be found they were in fault for not anticipating that he would turn suddenly toward the track and step in front of the approaching cars, for there was no apparent reason why he should do so. There was no evidence from which it could be found that it was better walking between the rails than on the shoulder of the embankment, that there was anything on the other side of the track which was liable to attract his attention, or that the train crew could have thought he was going anywhere but to the gravel pit. They knew there was no reason, if he was going there, why he should step between the rails until he got to the bars, and that the cars would pass him before he got half-way there. Neither was there any evidence of anything in his appearance which ought to have led them to think he was so engrossed in his own affairs that he might turn from a place where he knew he was safe to a place where he must have known he might be in danger, without looking to see whether or not he could do so in safety; for whether or not he knew how flying switches were made, he knew those tracks were in use on that day, and must have known that the cars were dropped in on them in some way, because it was obvious that only one end of the side track was connected with the main line. There was therefore no evidence from which it could be found that the defendants ought to have anticipated that the deceased would do what he did at the time he was injured.

2. Neither was there any evidence that the train crew could have done anything after they knew of the deceased's danger which they did not do to avoid an accident. Consequently there is no view of the case in which it could be found the defendants were in fault.

*Plaintiff's exception overruled.*

All concurred.

After the filing of the foregoing opinion the plaintiff moved for a rehearing, and both parties were heard upon the motion, by brief and orally.

*Taggart, Tuttle, Burroughs & Wyman* and *Andrews & Andrews*, for the motion.

*Branch & Branch* and *William H. Sawyer*, opposed.

PARSONS, C. J. The principal ground upon which the plaintiff asked for opportunity for further argument was the claim that in the opinion rendered the court had misunderstood the facts of the case. After exhaustive reargument, both oral and written, and careful reëxamination of the record, this claim does not appear to be well founded. The immediate cause of the injury to Lebrecque was his act in stepping from the place of safety where he was walking beside the track, almost directly in front of the cars which were then approaching upon the track. It is manifest that if he had looked to see if the track was about to be used for the purpose for which it was designed, he could not have failed to see the danger. On the question of the defendants' fault at the time, considering them to be responsible for the acts of the trainmen if they were in fault, the case is not to be distinguished from *Waldron* v. *Railroad*, 71 N. H. 362. Lebrecque was a man with some experience in railroad work and knew that the track was in use for the passage of cars, for the work in which he was engaged was loading cars which had been let down into the gravel pit to be drawn out, so that their contents could be utilized in filling the washout. He had worked at both places during the day. The trainmen were not in fault in not apprehending the possibility that with his knowledge of the use of the track, which they could rightfully assume he had, he would suddenly place himself in the path of the train without taking any precautions to see if it was safe to do so. The ruling of the superior court, denying the motion for a nonsuit upon the ground that there was evidence that the plaintiff was in the exercise of care, is not sustained. The opinion heretofore filed proceeded upon the ground, though it was not thought necessary to formally announce the position, that this ruling was erroneous. If Lebrecque's act was that of a man exercising ordinary care, the trainmen who had the same knowledge of the situation that he had would have been bound to anticipate and guard against it. But they were not bound to foresee that he would act without any care for his safety, and hence were not negligent in failing to anticipate his action. Upon this branch of the case the plaintiff's right of action is concluded by

the rule laid down in *Gahagan* v. *Railroad*, 70 N. H. 441. To sustain the plaintiff's action it would be necessary to overrule both these cases. The contention that Lebrecque had reason to understand that the work of the train crew would be suspended during the noon hour is not sustained by the evidence. He had been told that he, one of the shovelers, should have a full hour for dinner from the time work was suspended; but there was no evidence as to the length of time to be taken for that purpose by the train crew, or when they were to take it. That they were at work at this time was self-evident.

The plaintiff places his right of action upon the failure of the defendants to make some rule regulating the making of flying switches. The obligation of the master to make rules to secure the safety of the workmen in the performance of the work is a particular of the general rule which requires him to furnish suitable instrumentalities for the work; or, to state the obligation with entire exactness, requires of him personal care to that end. *McLaine* v. *Company*, 71 N. H. 294, 296, 297; *Hill* v. *Railroad*, 72 N. H. 518. It appeared that there was a rule that a flying switch should be made only when absolutely necessary. There may be various reasons why the making of flying switches is not considered sound railroad practice, and hence is required to be avoided if practicable. By this method, as it is understood, a train is separated for a greater or less distance, a portion being carried on by its momentum or the effect of the grade; and between the passage of the different parts a switch is thrown so that the following cars are deflected onto a different track. Whatever other objections there may be to the practice, it is apparent that the only danger to persons on or about the track is the approach without warning of the separated cars. It is manifest that for a train to pass over a highway crossing in two or more parts, without warning that others are coming after the first has passed on, would constitute a serious menace to travelers about to use the crossing, who might naturally understand, when a portion of the train had crossed, that the danger of immediate collision was over. The danger would arise from the fact that, as trains do not usually occupy the tracks of a railroad in close proximity to each other, prudent men would consider it safe to attempt to cross immediately behind a train. The duty of the railroad in such case to give warning of the approach of other cars would be clear. Failure to give such warning would be strong, if not conclusive, evidence of negligence. The duty imposed on the railroad finding it necessary to conduct operations of this character is to warn persons liable to be injured thereby. As it is to be inferred from the case that such operations are necessary at times, the negligence consists, not in making flying

switches, but in the failure to give proper warning. It is claimed that the action in this case was not properly a flying switch, but a "kicking" or letting the cars down by gravity upon the side track. If this action is technically better described by some other term, the principle upon which liability could be attached would be nevertheless the same—the lack of a warning.

The question in its final shape therefore is: Was Lebrecque entitled to a notice from his employers of the use which was proposed to be made of the track at this time? If he was, and received none through fault of his fellow-servants, he could not recover unless the master was in fault for not providing that a warning should be given. *McLaine* v. *Company,* 71 N. H. 294. If he was not entitled to a warning, it is immaterial that no provision was made for warning him. He was entitled to care on the master's part to make his work-place safe and to secure his safety in going to and from his work. There is no evidence that this duty was not fully performed. If cars were let down into the pit while Lebrecque and his associates were at work there, there is no evidence that the precautions taken were not sufficient to save them from harm. Lebrecque was not injured in going to or from his work. He had come out of the pit and got into the car to get his dinner. There is nothing to show any reason why his occupation of the track should have been expected or apprehended until the close of the noon hour. He was occupying the track for his own purposes; and in the absence of evidence tending to show that his presence ought to have been expected, the defendants are not liable except for failure to avoid injuring him if they could after they knew of his danger. *Brown* v. *Railroad,* 73 N. H. 568; *Shea* v. *Railroad,* 69 N. H. 361. If it was the duty of the defendants to provide by rule, in the case of the making of a flying switch, for a warning to those whom they had reason to apprehend might be in the path of the moving cars, nevertheless they were under no obligation to give such warning for the benefit of one whose presence they were not bound to anticipate. The plaintiff cannot recover except for the breach of a duty to Lebrecque causing the injury. It is immaterial that the facts may establish the breach of a duty owed by the defendants to others, which if observed would have prevented the injury. *Batchelder* v. *Railroad,* 72 N. H. 528.

*Motion denied.*

All concurred.